# CIRCUIT COURT OF BALTIMORE CITY

Filed October 3, 1892.

CENTRAL TRUST COMPANY

VS.

MARYLAND ICE COMPANY.

*John H. Thomas* for Central Trust Company of New York.

*Barton & Wilmer* for Maryland Ice Company.

*Thomas M. Lanahan* and *Frank Gosnell* for Arctic Ice Machine Company.

WICKES, J.—

At the request of counsel I have consented to hear and decide this case, which originated in a Court over which I was not then presiding, to promote as far as possible an early and final adjudication of the questions involved, upon which large and important interests depend. Without pausing to recite in detail the facts which give rise to these questions, for they are too voluminous for the limits of this opinion or the time at my command, I must advert briefly to some of them in order to be intelligible at all.

Ormond Hammond, Jr., the present receiver of the property of the company defendant, entered into a contract on the 28th of February, 1890, with the Messrs. Hooper, of this city, in which he agreed to purchase from them the building and premises on which have since been placed the ice machines, the ownership of which forms the subject of this controversy.

Hammond agreed to pay for the property $260,000, $150,000 of which was to be in cash, and the remaining $110,000 in second mortgage bonds of the company, which he then proposed to organize to operate the property. The first mortgage was not to exceed $250,000.

The building he agreed to purchase was already used for the manufacture of ice, and was partially equipped for that purpose, but in order, doubtless, to increase the security of the second mortgage bonds, which were to be delivered under his contract, he agreed to put in additional machines for the manufacture of ice, to cost from $130,000 to $150,000, and to furnish the Messrs. Hooper with a guarantee from Poor & Greenough, of New York, that these improvements would be erected on the property by the first of July of that year. On March 4th, 1890, Hammond entered into an agreement with the London and New York Investment Co., in which he recited his purchase from the Messrs. Hooper—his purpose to organize a company under the laws of New Jersey, to be called the Maryland Ice Co., to operate the property, and the said property was to be transferred to the new company in consideration of the issue to him of $250,000 first and $110,000 second mortgage bonds, and $500,000 of full paid stock, All the legal documents, including the bonds and mortgages to be issued, and all the details of the organization of the new company, were to be subject to the approval of the London Company, and prepared by or under the direction of its solicitors, but at the expense of Hammond. The first mortgage under this agreement was to cover all the property transferred to the new company and all property thereafter acquired by it and erected upon the premises. The London Company agreed to buy the $200,000 first, and $100,000 of the full paid stock for $180,000—it had already advanced $5,000,

paid by Hammond to Hooper on their contract. The London Company was, by this agreement, to have two directors in the new company and a representative in its treasurer's office, at the expense of the new corporation. It was also agreed that the London Company should retain the proceeds of the $200,000 bonds, after deducting the cash payment of $150,000 to Hooper and paying certain specified charges incurred in the organization, to be applied by it "to the purchase for and in the name and on behalf of the company of new plant and machinery for its corporate purposes."

This contract was signed by Hammond, and by F. A. Gans, secretary "for the American committee" of the London Company. On March 15th, 1890, Hammond and Sturgis (afterwards president of the company defendant), entered into a contract with the Arctic Ice Machine Manufacturing Company of Ohio for the purchase of the machines now in controversy, agreeing to pay for them $107,000— $35,000 on April 1st, 1890, and the balance in deferred payment for which notes were to be given. The contract contained the following clause, "And it is further expressly agreed that the title and ownership of said apparatus and appurtenances shall remain in the Arctic Ice Machine Co. until each of the aforesaid payments shall have been fully made."

On March 21st, 1890, the Maryland Ice Company was organized, and F. A. Gans became one of the incorporators and a director of said corporation. Under date of March 31st, 1890, Poor & Greenough, of New York, addressed to the Messrs. Hooper a letter, written in accordance with the agreement of Hammond, that they would guarantee that additional machinery would be placed upon the property. In this letter they state that such a *contract* has been entered into with Arctic Company, which together with boilers, etc., will aggregate a cost in excess of $130,-000, and they further state "the *contracts* we are assured are with thoroughly responsible people and supply the guarantee you desire." In a postscript to this letter dated April 5th, 1890, written by Mr. Greenough in Baltimore when the mortgages were about to be executed, he stated that "the Maryland Ice Company had de-

posited with us the funds called for by the within described *contract*, and we hereby agree *that they shall be applied in accordance therewith.*"

Mr. Greenough it must be remembered, was *not only* a member of the firm of Poor & Greenough, but a *director* of the London Company, and *Chairman* of the American Committee, which he says was composed of five directors, and of which Mr. Gans was secretary as we have seen.

On April 5th, 1890, the property from the Messrs. Hooper was conveyed to the Maryland Ice Co., it having been substituted for Hammond as purchaser. The mortgages were executed the same day and contained a covenant that additional machinery would be placed upon the property, which was made subject to its lien.

Mr. Greenough for the London Company took $200,000 of the first mortgage bonds, and Poor & Greenough took the remaining $50,000.

The books of the London company show that $75,000 "proceeds of bonds," was deposited April 3d, 1890, $35,000 of which was paid to the Arctic Company the same day, being the first installment on the machines, as called for by the contract.

On May 7th, 1890, Sturgis and Hammond assigned their contract with the Arctic to the company defendant, with the consent of the Arctic Company, which consent seems to have been based on a letter from Humes, the agent of the Arctic (who had executed the Hammond and Sturgis contract for that company), which letter was produced in evidence at the call of the plaintiff, in which he states that he had just had an interview with Sturgis and Gans in which they had assured him that· everything was on a "sound basis" and that, "there will be about enough money left over from the bonds to pay our deferred payments, besides paying off the other indebtedness."

The stock of the Maryland Company was owned as follows: one-fifth was owned by Sturgis, President; one-fifth by Lane, Secretary; one-fifth by Hammond and two-fifths by the London Company and Poor & Greenough.

Upon all these bonds the company defendant defaulted on September 1st,

1891. The trustee filed a bill, a receiver was appointed, and in a few days, the Arctic Company presented its petition, praying the return of the machines which they claim by virtue of their contract, no further payments having been made upon them.

The contest is therefore between the first mortgage bond holders, represented by the trustee, and the Arctic Company, the Messrs. Hooper having admitted through their counsel, who also represent the Arctic Company, that they consider themselves bound by notice of the contract, and assert no title to the machines in question by virtue of their mortgage as against the Arctic Company.

The principles of law which apply to these facts are well settled in this State.

I cannot doubt that in the ordinary course of law the ice machines attached to the freehold as they are, would be considered fixtures subject to the lien of the mortgage. The clause in the contract however under which they are furnished provides that until full payment is made "the full title and ownership" shall remain in the Arctic Ice Company. Such contracts are recognized in law, and have been approved and enforced in this State. Walker vs. Schindell, 58 Md. 360; Lincoln vs. Quinn, 68 Md. 299, and many other cases.

Indeed I do not understand it is doubted that as between the parties to the contract, it must be considered binding and valid. The Trust Company asserts however on behalf of the mortgagees that they had no notice of this provision in the contract and are therefore not bound by it. The contention is doubtless sound, unless notice, actual or constructive, is brought home to the mortgagees.

The recent English cases cited in the argument (Cumberland Co. vs. Merryport Iron Co., page 415, Ch. Div. Law R. for 1892) seems to have been decided irrespective of the questions of notice, and upon the broad ground that the vendors of the machinery never parted with their title, and that the mortgagors could not confer upon the mortgagee a better title than they themselves had.

But this is not the doctrine of our Courts, for beginning with Hale vs. Hinks, 21 Md. 406, affirmed with emphasis in Loncoln vs. Quinn (supra), it is decided that notice is necessary against either an innocent purchaser or mortgagee.

But this notice need not be actual, it need not only be constructive, which is defined to be "information of matters which fairly put a party on inquiry," when, according to the established rule, he must be charged with notice of every fact which that inquiry would have ascertained. This is only one of the many ways of stating the rule of law, for in various forms it is found in many of our cases. In the case of a fraudulent sale of goods, it must be such notice as to put a prudent purchaser on inquiry—in the case of a contract such knowledge of its existence, coupled with such circumstances as would make a prudent man investigate it, or else be charged with knowledge of its contents.

This principle is stated in the cases already referred to and is too familiar to need further citation.

Under this well settled law, do the facts justify us in finding that the London Investment Company and Poor & Greenough are chargable, with notice of the terms upon which these machines were placed upon the premises of the company defendant?

It was argued with force that the mortgages were recorded before the machines were placed upon the property, and the Arctic Company was bound to take notice of the provisions which subjected to the lien of the mortgage after acquired property.

But the contract for the machines was executed on March 15, nearly three weeks before the execution and recording of the mortgages.

Gans had already contracted for the London Company in reference to the purchase of these very machines. He was secretary of the company and also an incorporator and a director of the Maryland Company.

Greenough had written the letter of March 31, stating that the machines had been contracted for and the postscript of April 5th in which he said the money had been deposited with his firm to pay for them. Greenough as one of the firm, as we have seen of Poor & Greenough, and a director, and chairman of the American Committee. of London Company.

The firm and the company took the bonds after all this had been said and done in reference to the machines. Both Gans and Greenough knew there was a contract with the Arctic Company, but neither seems to have felt bound to ascertain its contents. This is the more remarkable because it was not only accessible to both from the time it was made, but both had assumed obligations in reference to it.

I can but think that before and at the time the mortgage was executed and recorded and the bonds delivered to Greenough that his relation to these transactions were of such a character that he ought, as a prudent man representing so many interests depending upon this very contract, to have inquired into the terms upon which these machines were to be furnished. Had he done so, he would have ascertained the provisions of the contract, and could probably at that time have protected several interests which have since suffered. He could also have declined to accept bonds not in accordance with the contract upon which his company had agreed to take them. Having failed in its duty in this regard, I am of opinion that the firm of Poor & Greenough and the London Company, both represented by Mr. Greenough in these transactions, are chargeable in law with a knowledge of all the facts an investigation of this contract would have revealed, and that this lien upon them cannot prevail over the contract rights of the Arctic Company.

It is said the American committee is but an advisory board to the Home Company, but composed, as it is, of five directors, it can scarcely be said we are required to look beyond them in order to bind the foreign corporation they represented.

It is evidence that a small number of the bonds taken by Poor & Greenough have been disposed of, but there is nothing to show that they have passed into the hands of innocent holders for value. The remaining bonds are still held by the original parties.

I had some doubt as to whether the machines in question do not constitute an exception to the general law regarding the severance of fixtures. According to the testimony, they are so large and cumbrous that they cannot be removed without injury to the building—not permanent, but temporary. But in examining the cases, I have come to the conclusion that this is a matter to be regulated by the contract of the parties, and is not governed by any fixed rule of law.

This view of the case renders necessary a consideration of the question of damages alleged to have been sustained by the Ice Company, because of the failure of the Arctic Company to comply with its contract in the delivery of the machines. Assuming as proved, and I think the weight of the evidence fairly establishes it, that on November 8th, 1890, the machines were handed over and accepted by the Ice Company, it also shows that the company reserved the right to claim damages for the unreasonable delay on the part of the Arctic Company, in completing said machines. Under the contract two were to be ready by June 1st, and the remaining machine by August 1st. We have seen they were not handed over as complete until November, long after the principle season had closed for the sale of the commodity which they were intended to manufacture. The contract provides for a "reasonable time" in which to make machines accomplish the results promised (to wit the manufacture of a certain quantity of ice), caused by "oversight or defect in construction," but it does not even upon a technical construction provide for the great delay and consequent loss, alleged in this case. The proposition that a Court of Equity may determine the amount of damage sustained, that it may be recouped from the value of the machines, while unusual in our practice, seems to be supported by authority. But the difficulty in this case, assuming the authority to exist, is found in the want of evidence upon which to base an accurate estimate. Besides which under an attachment proceeding in the Superior Court, and now pending in the Court of Appeals upon a question of jurisdiction, this very question of damages is raised and ought, in my opinion, to be decided by a jury.

Three witnesses it is true were examined by the plaintiff as to the "rental value" of the property, a form of question approved by our appellate Court. But it is impossible to consider their estimate of loss as based on anything but the *profits* the company

would have made during a summer when ice was scarce and exceptionally high in price. The estimates range from sixty thousand dollars up, exceeding in amount in every instance the probable value of the machinery. I can but think it is a question for a jury to determine under proper instruction as to the law, which rules out mere "profits as a standard or measure of damages because speculative and uncertain."

If the Court of Appeals shall be of opinion that I have erred in the conclusion reached and that the mortgagees are entitled to hold the ice machines as against the Arctic Company, the question of damages will be disposed of without further inquiry. But, if on the contrary, they sustain the view expressed in this opinion, the amount of loss the company defendant sustained can readily be ascertained with the aid of a jury.

A decree prepared in accordance with these views will be signed.